## WILLIAM QUINN v. ST. PAUL BOILER & MANUFACTURING COMPANY.[1]

January 29, 1915.

Nos. 18,948—(174).

**Injury to servant — judgment *non obstante*.**
    1. In this a personal injury action by a servant against his master, there is not such an absence of evidence to sustain an alleged failure of the master to discharge one of his absolute duties that defendant is entitled to judgment notwithstanding the verdict.

[1] Reported in 150 N. W. 919.

---

Note.—On the question of the right to judgment *non obstante veredicto* because of failure of proof, see note in 12 L.R.A.(N.S.) 1021.

**Evidence.**

2. There is ample evidence to establish the facts which under the court's instruction warranted a recovery. No error is assigned upon the charge, and, right or wrong, it must be accepted as the law of this case.

**Damages excessive.**

3. The damages awarded are considered excessive.

Action in the district court for Ramsey county to recover $32,000 for personal injuries received while in defendant's employ. The case was tried before Dickson, J., and a jury which returned a verdict in favor of plaintiff for $9,850. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Affirmed on condition.

*Denegre & McDermott* and *Harry S. Stearns,* for appellant.

*Duxbury, Conzett & Pettijohn,* for respondent.

HOLT, J.

Plaintiff while working for defendant was injured. This action followed, the injury being attributed to defendant's negligence. Defendant appeals from the order denying its alternative motion for judgment notwithstanding the verdict or for a new trial.

The defendant is a corporation engaged, among other things, in putting up, taking down and moving metal smokestacks, metal breeching, etc., in factories and large buildings. On Saturday, July 5, 1913, defendant started to move the smokestack and take down the breeching in the boiler room of the Waldorf Box Board Co. in St. Paul. It was to be done in three days. This room is about 50 by 60 feet in dimension. The boilers are in the northwest corner and extend south to within 25 feet of the south wall. The smokestack, about 4½ feet in diameter, of sheet steel, stood at the time within a foot of the south wall and about 25 feet from the southwest corner of the room. The smoke and gases were conducted from the vent of the boilers near the west wall by a huge pipe, variously estimated as 4 feet wide by 5, 7, or 9 feet high, made of sheet steel, riveted together. This pipe, called the breeching, passed from the boilers south along the west wall, but at a distance

of from 2 to 3 feet therefrom, and at a height between the bottom thereof and the floor, of 18 or 20 feet. When within 3 or 4 feet from the south wall, it branched in two directions, each branch being of the same dimensions as before stated. One of these branches turned to the east and ran along the south wall, at a distance therefrom of about 3 or 4 feet, and at the same height from the floor as already stated, until it reached the smokestack which it entered by means of an elbow. The other branch dropped down to the floor and ran along upon the floor, directly beneath the one above, until it reached, and also entered the stack. The part of the stack between where the two branches of breeching entered contained, or was called, the fan. Four or five 16 or 18 inch iron I beams ran across the room from north to south at about the same height as the bottom of the breeching, that is 18 or 20 feet from the floor. These I beams supported a contrivance for heating the water before it entered the boilers. It is spoken of as the economizer. Its shape or dimension is not given but it evidently needed some attention, for the owners of the factory had laid upon the I beams a plank platform, which came within about 12 feet of the south wall, so as to have ready access to the economizer, the top of the boilers, and whatever machinery and appliances were located at that height. The platform was reached from a ladder on the east side of the room.

Defendant's undertaking was to move the smokestack from the south wall and place it against the west wall of the room. This necessitated taking down the stack, and removing the breeching, at least all thereof parallel with the south wall. On the Saturday mentioned, a crew of four or five men under a foreman, accompanied by Oscar W. Olson, an officer and superintendent of defendant, began the work. The foreman and part of the crew worked on the outside, rigging up a gin-pole, an instrumentality necessary in taking down large smokestacks. Olson and the others worked inside. The record is vague as to what particular work was done inside on Saturday. Plaintiff contends that preparation was then made by placing planks as staging for the larger crew which was expected there Sunday. But undoubtedly some rivet cutting upon the breeching took place on Saturday and perhaps part thereof was

then removed. Plaintiff was working for defendant Saturday, but in another part of the city. Sunday morning he, with some other men, was set to work in this boiler room cutting rivets upon the breeching. No scaffold, properly speaking, had been erected on Saturday, and none was erected on Sunday. But it appears that the men got to the breeching from the platform and I beams mentioned, and, when the beams and permanent structures did not furnish the needed place whereon to work, planks, procured from somewhere on the premises, were laid upon the I beams or other pipes or supports found at that height in the room. Whether one or more planks were used on the north and east side of the breeching is left in uncertainty, but the evidence shows three planks laid between the breeching and the walls—one along the south wall, one along the west wall, and one witness seems to think that another shorter plank was laid across the corner in some way. When plaintiff in obedience to Olson's order, as he claims, went to cut rivets between the breeching and the walls he had to pass over the plank laid along the south wall. It was insecurely placed at the west end and wabbled or tipped, causing plaintiff to fall.

The jury were justified in finding that this plank was placed there on Saturday, July 5, although Gust Wonhala, the man who worked with plaintiff at the time of the accident, testified that he and plaintiff procured the plank on Sunday forenoon and placed it in position.

The question presented is: Assuming that this plank was negligently placed in an unsafe position on Saturday, when plaintiff was working at another place, by one of defendant's servants, is defendant liable? The negligence charged was failure to provide plaintiff a safe place to work; negligence in constructing the staging or scaffold upon which plaintiff was ordered to work, particularly in respect to the plank mentioned; and other grounds not here important. The answer denied negligence, and set up contributory negligence, assumption of risk, and negligence of fellow servant as the sole causes of the injury.

The trial court thus charged the jury: "Of course, if the evidence of Mr. Wonhala, as given in this case, is true, and Mr. Quinn

128 M.—18.

did help him put that plank there, he cannot recover; and if the plank was placed there by some other member of the crew on Sunday, at a time when Mr. Quinn was engaged there with the crew in this common work, and the work on Sunday included the work of furnishing places upon which to stand as they progressed with their work, then Mr. Quinn cannot recover in this action; and he can only recover by showing by a preponderance of the evidence that the plank was placed there on Saturday at a time when he was not a member of the crew, that it was placed there for the express purpose of the men standing upon it to do the work, and that he was ordered and required to go upon the plank to do the work, that it was insecurely placed and that such insecurity was the cause of his falling down from it.

"If the plank was placed there by the defendant on Saturday for the purposes of a scaffolding or a staging, a question will arise as to whether or not it was a reasonably safe place.

"The duty of a master when furnishing a place in which his servant is to work requires him to use ordinary care to furnish a reasonably safe place in which to do the work, and it is for you to say whether or not the plank as placed was placed in a reasonably safe and secure manner."

No exception to the charge was taken on the motion for a new trial, nor is error assigned thereon in this court. Therefore, right or wrong, the instructions set out must be taken as the law of this case. Smith v. Pearson, 44 Minn. 397, 46 N. W. 849; Bergh v. Sloan, 53 Minn. 116, 54 N. W. 943; Bates v. B. B. Richards Lumber Co. 56 Minn. 14, 57 N. W. 218; Kleis v. Travelers Ins. Co. 118 Minn. 422, 136 N. W. 1101; Bertram v. Bemidji Brewing Co. 123 Minn. 76, 142 N. W. 1045. The question whether the negligent placing of the plank in position on Saturday affected the right of recovery cannot be considered under the assignments of error. Nor is the refusal to dismiss an available error here, if, when the evidence was all in, there was sufficient to go to the jury upon defendant's liability.

However defendant's assignments that he should have had judgment notwithstanding the verdict, and that there is no evidence to

sustain the verdict on the theory upon which the court did submit the case, are open for consideration here. George A. Hormel & Co. v. American Bonding Co. 112 Minn. 288, 128 N. W. 12, 33 L.R.A. (N.S.) 513. The two may be treated together. There is ample evidence that the plank which caused plaintiff's fall was negligently placed. Although there is some contradiction and confusion in the evidence, the jury could find that the plank along the west wall was so laid that the south end rested upon a bracket projecting from that wall, thence passing directly under a bolt near by, which extended from the wall some 12 inches, and that the west end of the plank from which plaintiff fell rested upon this bolt. The bolt, running lengthwise of the plank, would readily cause the plank to tip or wabble, especially if a person approaching the west end should not step directly over the center line of support furnished by. the bolt. There is also some testimony to substantiate the claim that the plank was a necessary staging or appliance which the master undertook to furnish the men to stand on in doing their work and which was the master's nondelegable duty to furnish. Enough was shown in the situation to have warranted a submission to the jury of defendant's negligence in that respect. We cannot say, as matter of law, that the work was so simple that no plan for a staging was necessary or that it conclusively appears that the men themselves, as the work progressed and as an incident thereto, supplied such planks and staging as was rendered necessary, so as to exclude the case from the rule in Sims v. American Steel Barge Co. 56 Minn. 68, 57 N. W. 322, 45 Am. St. 451; Hagerty v. Evans, 87 Minn. 435, 92 N. W. 399; Northrup v. Hayward, 99 Minn. 299, 109 N. W. 241. Nor is there a failure of proof on the theory along which the trial judge instructed. The jury did not accept Gust Wonhala's testimony that the plank was placed in position on Sunday. Aside from his evidence there is nothing to show by whom it was placed, but there is substantial evidence from employees in the factory that no planks were between the breeching and the walls until defendant's crew began work on Saturday, upon which date they first noticed the planks there. We also think there is room for the inference that Mr. Olson on Saturday made preparation for the Sunday work

when the large crew was expected, and that this plank was placed on Saturday "for the express purpose of the men standing upon it to do the work," and that plaintiff was required to go upon the plank to work.

Is the verdict excessive? The neck of the femur of plaintiff's right leg was fractured, also there was some fracture in the shoulder joint. The trial took place eight months after the injury. The doctors were of the opinion that the surgical treatment afforded plaintiff had caused as good a union of the bones as could be expected. The leg was shortened about an inch. The callus thrown out at the point of the shoulder and at the neck of the femur interferes with the movement of the limbs. The experts do not doubt that he will have a serviceable leg and arm, though somewhat limited in movement, depending on the absorption of the càllus. Plaintiff was bound to have a use both of his arm and leg according to his medical expert, although it might take a year more for a substantial recovery. Aside from the shortening of the leg the calluses seem to be the only baneful effect from the injury. One doctor testified that the absorption of a callus cannot be expected to begin until about eight months after the fracture begins to heal. No evidence of any medical or hospital expenses appears. At the time of the injury plaintiff was 49 years old, earning 25 cents an hour. He was a farmer and ordinary laborer. There is no injury or suffering except such as usually attend the painful recovery from a fracture where it is necessary to place weights on the limb to keep the bones in position. The verdict was for $9,850. We consider it excessive, unless the anticipated improvement in the use of the limbs should fail to appear. We think therefore that a new trial should be had, unless plaintiff at this time deems $7,000 a proper compensation which he is willing to accept.

The order, insofar as a new trial is denied, is reversed and a new trial is granted, unless plaintiff, within 10 days after the remittitur is sent down, file in the court below written consent to a reduction of the verdict to the sum of $7,000. If such consent is filed no new trial shall be had.

Affirmed conditionally.